seated we will be happy to hear from Mr. Connett. Thank you your honor may it please the court I am here with my co-counsel Caitlin Walton on behalf of the plaintiff appellant Kimberly Stoddard. In the summary judgment hearing counsel for UNUM noted that this case is a close case and therefore since UNUM is entitled to an abuse of discretion standard it should prevail. The trouble with the case like this is that you really can't weigh the evidence in that fashion without first determining whether UNUM had conducted a reasoned and principled inquiry. For that reason the real focus on this case is whether UNUM conducted that type of inquiry whether it gave Kim Stoddard a full and or not and the reason for that of course is that the abuse of discretion standard comes from the law of trust. It is earned by a fiduciary who in carrying out fiduciary duties required by ERISA and under the terms of the plan conducts a full fair impartial review. So in calling this a close case we believe that UNUM has pulled the attention away from the shortcuts that it took in driving toward a desired result. I want to turn now to the scope of what is before the court. This is an own occupation case meaning that all Kim Stoddard has to do is show that she is disabled from her former occupation as a creative director. If she had to show that she were totally disabled from any substantial gainful activity she likely would not be able to do it. Indeed that's why the administrative law judge determined that she's not eligible for social security disability benefits back in 2010. And so that brings us to What's a creative director? A creative director, the job description is in the record. It involves working with What's the JA site, do you know? Hold on just a minute. There are several places in the record, Your Honor. The first own page is page 124 of the JA. 124, I got it. Yes, it's where UNUM had determined that it has to be a full-time job. And then on pages 555-556 is a vocational assessment that was done by UNUM saying that the job requires a high aptitude in the areas of general learning ability, verbal aptitude, spatial aptitude, et cetera. And also that it has constant mental demands for concentration and attention, work schedule, working despite work distractions, work completion on deadlines is essential. Those are in her job description. The other place to look for the job description, and I apologize for not having the JA site, is Kim Stoddard's statement or which was submitted as part of her appeal. The difficulty is that the record indicates that she was deeply involved with two TREC organizations. Yes. And while she was involved with those two TREC organizations, she was doing the same kind of work that she was with her former employer with the designing with the logo and website and trade show designs and the rest. So it's not often that you have a Social Security disability case where somebody is actually performing the work that she did previously. That is correct. And I think that's a foregone conclusion because she's not disabled from any substantial gainful activity. Social Security, you're saying it's irrelevant. It is irrelevant. It's a different standard. She had to be, in this case, under this policy, had to be disabled from the job that she'd been doing. That's correct, Your Honor. As a creative director. That's what I'm trying to figure out. I mean, it sounds good, but you've got to be pretty smart. You've got to be involved. I don't know if the director knows, but I couldn't figure out if there was a specific job description written by the employer as to what she did. All right. There is a job description in the record that comes from 2004, and I apologize for not having the JA site. That's all right. There's also the statement by Kim Stoddard herself that has a description. It's like a summary or an explanation of whatever the job description is. Yes. You go ahead with your argument. Thank you, Your Honor. But under the UNUM policy, you have to show that you could not return to your former job. That's correct. And that's what the policy provision, and yet she seems to be performing. She is performing. Her former job. She is able to do some of that work on an occasional or part-time basis. We readily acknowledge that. The trouble is that she cannot do it on a consistent 40-hour-a-week basis, which is what's required under the policy. Well, I mean, maybe, but the district court and others pointed out, you say she couldn't do it, but she's training a wild Mustang? Yes, Your Honor. You know, and then I guess she's jumping. It says, the opposing counsel says the Mustang is trying to, jumping and trail riding and obstacle work. I mean, that's a heck of a lot more than most people. Your Honor. More power to her. I think what is being referred to by counsel is that under the TREC, T-R-E-C, we pronounce it TREC, there are levels of it, and some levels do involve jumping, things of that sort. Well, is she, she was training the Mustang? I think she did train a horse, but I'm not sure what's involved in that, and that's one of the open questions here. Well, but you have the bird. Yes and no, Your Honor. That's a classic lawyer. Don't you love it? Yes and no. Your Honor, we readily admit that she was training the Mustang. She is involved in horseback riding and also trail riding and this TREC organization. In fact, this has been, or should have been known to Unum for quite some time, going back to 2010. This is a question I have. If she is jumping and trail riding and training a wild Mustang, and she's taken up TREC, which, you know, we recognize is a physically demanding sport, and she's doing with TREC, so I just wonder if there's any problem with her, with her stamina, which seems to me to be what you're talking about, and she's performing with these two TREC organizations. Yes. The same work that she was doing with her homo, with Unum. Yes. Your Honor, you're raising two points here, and I want to address them both. First, as to her stamina, yes, it does take stamina to ride a horse. The question is, how frequently is she riding and for what periods of time? Would she be able to do it on a sustained basis? Based on her statement, based on the contemporaneous statements of people who have been involved with her in this riding, the answer is no. She can ride one, sometimes two days a week, sometimes not at all. That's what the record shows. The question is whether the insurer or the plant administrator is abusing the discretion, and this is not a bad actor, because they paid her long-term disability benefits for over 10 years. So, you know, sometimes you get people that are slamming the door in somebody's face and saying, you're not going to get a penny from us, but in this case, they paid LTD benefits for over 10 years. Correct, Your Honor. The problem, though, in the analysis is that she can do these activities on an occasional basis, but it depends on how she's doing on any given day. And where you have a credibility determination like this, clearly, if I were Unum, I would want to know more about this. But rather than determining whether she can have that kind of stamina day in and day out to enable her to work a 40-hour week, or rather than looking at the cognitive demands of her job and whether she can do that, Unum basically has made some credibility determinations and a couple of leaps there on the stamina and cognitive parts. There's quite a bit of evidence before Unum. We haven't even touched on some of it. I mean, she was traveling to Italy and New Zealand and Alaska. I mean, it's just at a certain point when you see somebody training the horse and riding the horse and going to Italy and New Zealand and Alaska and performing the work that they previously performed, you sort of wonder, you know, is this, it can't be that the claims administrator is abusing the discretion. I mean, they have a finite amount of sums and there are a lot of people who have claims on these sums and claims administrator could say, well, wait a minute, we want to save these funds for deserving applicants. Certainly the horseback riding and the volunteer work with TREC raises questions and certainly Unum is entitled to look into those and if Unum determines that she is not disabled, then they have the authority to terminate benefits. What we're saying in this case, though, is that they made too many leaps in reaching that conclusion, primarily by not considering whether she can do these activities on a sustained basis and whether or not the horseback riding that she does as an activity would give her a similar level of stamina that she could apply every day, eight hours a day, five days a week to her job. That's what we're looking at as the key problem in this case. All I can say to you is that the district court looked at this record and Judge Eagles twice said that the district court has a lot of evidence in here that makes me think she's prevaricating and malingering and she is way underestimating what she's capable of. And so the district judge, Judge Eagles in this case, very fine district judge, thought that she was way underestimating her ability to do these activities. And that she was not shooting straight with the benefits administrator or with the court. When a district judge gets that impression that somebody's not shooting straight with them, you know, that's something we have to take into account. And she made that statement. I know she made it once and I think she made it twice. That she was fundamentally thought this person was quite capable. And there's a basis for that. Right. She has lots of capabilities. MS doesn't make you stupid. When was she first diagnosed? She was first diagnosed, I believe, in 2005. 2005? Yes. And that's when Unum agreed that she was disabled. She applied and I think that Unum made its determination in late 2005 or early 2006. And they paid her benefits for about 10 years. They did, Your Honor. And then they changed her mind. Right. Now, if she gets worse five years from now, Unum come back and change her mind again? No, Your Honor. She's out. Once they say disabled, you can't come back. You can't come back and she's no longer covered. And that's the problem here when you balance the harm. From my standpoint, if this is sustained, that's the end of... That's the end of the line for her. For these benefits. Yes. And so what we're saying essentially is that because of the credibility determinations that had to be made and because of the questions of whether or not she can do these activities on a sustained basis, Unum had a responsibility to take a deeper look. I'll give a simple example. When Unum first provided benefits, they sent out a field investigator, which is fairly typical in a claim like this. The field investigator spent an hour and 50 minutes at her house interviewing her about the full range of her activities. But when Unum started looking at this trek and horseback riding activity, they called her on the telephone. I think it was September the 14th. They spoke to her for a total of 14 minutes. And they did not ask specific questions about how many days a week are you riding, how many days a week are you doing volunteer work. They just leapt over all of that. And you all argued that someone that has this disease has good days and bad days. That's the gist of it, Your Honor. They do. A good day they can do about anything and a bad day they can't get out of bed. Correct. And under this policy there is what they call a work incentive benefit where people are essentially encouraged to work. The first 20 percent of their earnings is ignored. And then there's a formula where it creates a win-win where if the person is able to continue working, the benefits go down. We all want people to work and to be as active in their lives as possible. We don't want them to go home and just go to bed and draw the blinds. And indeed, Kim Stoddard can do some work. There is a statement in the record from someone who employs her on an independent contractor basis talking about how it's basically a sheltered workshop situation where she's working as she is able to. But my goodness, at least she's trying to do some work. Could she have gotten back her job with Unum at this point? Back her job with her former employer, you mean? No, Your Honor. There are a couple of reasons for that. One, she's not able to. But the other is I'm not sure this particular company is still even in business. That's just not something in the record. Okay. Thank you. All right. Mr. Dean, we are happy to hear from you, sir. May it please the Court. My name is Jamie Dean. I obviously represent First Unum Life Insurance Company. Your Honor, there's no dispute that Kimberly Stoddard has multiple sclerosis. But that diagnosis alone... The diagnosis of MS alone doesn't dictate that she's disabled. I'd like to begin by addressing a few questions that the panel asked of Mr. Kinnett. First, I believe Judge King asked where the job description is found. If you look at page 125, that's where Unum determined what the job description is in more general terms, and it describes it as being design layout, meet clients about design layout and working with design teams. Importantly, what I wanted to note also is that if you look in the policy, and I apologize I don't have the specific Joint Appendix page number for this, but it's conceded in the briefing, when Unum considers Stoddard's capacity to work in her occupation, they're able to consider that occupation as it's performed in the national economy. And so while Ms. Stoddard worked in a New York City firm where she was doing 60-hour weeks before, that's not the job description that Unum is permitted to consider. And then Judge Wilkinson, you asked a few questions about whether Stoddard is performing work, or you mentioned that she's performing work for two TREC-related non-profits. I wanted to point out that in addition to that, she's doing part-time pay consulting, and if you look at the declaration from her employer, that employer is the wife of the husband who owned the New York ad agency. So she's not only doing work for TREC USA and Usenet, but she's also performing work essentially for the same prior employer, whether or not that company still exists. And then just a final point, Judge Wilkinson, you asked about the Wild Mustang. That's not Unum's extrapolation from the record. If you look at page 518, Ms. Stoddard has an online statement. She describes that she came to TREC with her Wild Adopted Mustang, whom she had adopted and trained. And importantly, she said she came to TREC after they'd already done jumping and some obstacle work. So she didn't come to this sport for therapy, she came to this sport for a greater challenge, and she's lauded the challenge of TREC in her other communications about the sport. Mr. Kinnett addressed the argument that Unum did not engage either in the sport in a thorough process of evaluating Ms. Stoddard's claim. But I think the timeline undermines that assertion. As Judge Kinn pointed out, Ms. Stoddard was on claim from 2005. In 2008, the Social Security Administration first determined that Ms. Stoddard was able, well, was not disabled, and at one point in 2008... I'm pointing out, Your Honor, that if the argument is that Social Security is, or if the argument is that Unum was looking for its first opportunity to get rid of Ms. Stoddard, they would have done it in 2008 when the Social Security Administration said she could do the job, and they would have done it, or they would have done it in 2011 when the Social Security Administration again said that she was not disabled. But I agree with you that Social Security is a different standard and that that's not something that Unum was required to give. So you only offered the Social Security ruling for a limited purpose of showing that when they decided that she was not disabled, you were willing to go ahead, your company was willing to go ahead and pay benefits. Right, Your Honor. That's pretty good that you turned that around on them, yeah. Well, it was their argument below that we should have considered it more fully, but I think as the Court has already said, that decision wasn't entitled to any deference. Although I'd point out, Your Honor, the Social Security Administration, the evidence that was presented to the ALJ was considered by Unum and was helpful to Unum's case because, of course, Ms. Stoddard talked about her travel. They recognized that they had to adjudicate this under their own policy. That's absolutely right, Your Honor, and they did. This case has been examined not only by the different steps of the Social Security Administration under, admittedly, their standards, but also by the claims administrator and also by Judge Eagles, and there have been a number of different entities that have looked at this, and none of them, as I understand it, have found her disabled. That is correct, Your Honor, and just to point out one more thing about Social Security that they raised below is that the occupations that they were considering as far as her past relevant work at the Social Security Administration level were different from the creative director position that she held that was at issue in this case. And so they've argued in brief that that shows she couldn't do past relevant work, but the positions that the Social Security Administration examined were different, and one of them in particular was a light-duty occupation, which is greater exertion level than her sedentary job. Ms. Stoddard has also argued that Unum failed to ever consider whether she could do her job full-time 40 hours a week. Your Honors, that was the central question in Unum's entire review process. If you look at page 583, the very first question that Unum asked one of its reviewing physicians to answer was whether Stoddard lacks the predictable and sustainable capacity to perform the physical demands of her own occupation on a full-time basis, and asked the same question of that reviewer as to her cognitive capabilities. On appeal, they asked a board-certified neurologist a similar question, whether Stoddard has the functional capacity to perform activities consistent with those of her occupation on a sustained and full-time basis. So it wasn't lost on Unum that Ms. Stoddard has MS, but the question that they addressed at both levels of this review was whether that MS prevented Ms. Stoddard from doing her job on a full-time basis. Neither was the notion that MS is a variable disease ignored. There was discussion with Mr. Canette about MS, and Judge King noted that it is a disease where a patient can have good days and bad days, but Ms. Stoddard told her own neurologist in 2008 that she hadn't had a relapse in two and a half years, and she told the Social Security ALJ that she hadn't had a flare-up since 2005. And so that's pretty strong evidence that her MS activity is minimal at best. What was her age when she was diagnosed? I think her age was in her late 20s, Your Honor. That's just working backwards. It was in her late 20s or early 30s. And it's interesting that I guess this is a typical pattern of MS. Unum's neurologist pointed out that, and this is at 779 and 780, a typical pattern in multiple sclerosis is for the disease to be more active at the outset and then to stabilize. That's exactly what happened in Stoddard's case and explains the symptom exacerbations at the outset of her diagnosis that aren't present in the more recent years. There are mild and severe forms of the disease, and sometimes it can run a variety of courses. A lot of times it can become progressively worse, and other times, as you say, it can be worse at the outset and then just stabilize for long, long periods of time. So this term is an umbrella term, but within it are all kinds of variables, wouldn't you say? Absolutely, Your Honor. And Dr. Crawford, her first point about multiple sclerosis is that it's a variable disease. And so just the diagnosis alone doesn't mean that a particular patient will be disabled. But your position has to be that she didn't stabilize. She improved because you agreed that she was disabled for 10 years. Well, I wouldn't put it quite— So she must have gotten better or got well. I wouldn't say that she had to have gotten well in the sense that her diagnosis had to go away. Not at all. And I wouldn't go so far, Your Honors, to say that I had to show she improved because the Fourth Circuit hasn't gone there in cases like Scott v. Eaton and Evans v. Eaton where a claimant was taken off claim after being on claim for a few years because the Fourth Circuit's always said you don't have a vested right to benefits once you're on claim. But I would say that this test is always— But you all agreed she was disabled in 2005. That's right. So if she's not disabled in 2015, she must have gotten better. The test— Maybe you were wrong. Maybe you were wrong in 2005. Well, that's always a possibility. But I do think the evidence shows that whether or not her MS has changed, her ability to cope with and deal with that disease significantly improved. And we see that particularly in the 2011 to present timeframe when she commenced her equestrian activities. She started two businesses. She began—she managed all aspects of a rental property at her home. She's engaging in significant travel. All of that evidence is at greater capacity. What I was going to say a moment earlier, Your Honors, is that the test is always an objective one under the policy. The test is always whether she can perform the material and substantial duties of her occupation. And just because an administrator realizes that she— or believes that she can't at one point, when new information comes to light, like both the evidence of Ms. Stoddard's activities and the other medical evidence in the record, there's no abuse of discretion when you go back and say, at this point, you can do those duties. Again, it's not tied to the presence of a medical diagnosis. She has to have an illness or a sickness. But once that is established, the question is whether she has capacity to work. Is there anything further that you wish to add? No, Your Honor. Unless the Court has any further questions for me, I'll simply conclude— Let me ask my colleagues if they have any. Do you have any questions? Is Orange County over around Durham or Chapel Hill? Chapel Hill, Your Honor. Chapel Hill. Excellent memory. Yes, sir. Chiefs of Orange County. Yes, that's right. We have no further questions. Thank you, Your Honor. Mr. Connett. Thank you, Your Honor. Just very briefly to touch on a couple of points. Judge Wilkinson correctly noted that MS takes many forms and affects people in many ways. As Mr. Dean said, sometimes MS will stabilize over time. In this particular case, Kim Stoddard says thank goodness for that. It's a tribute. It says that her care is proceeding well. But to understand in Kim Stoddard's particular case how her MS affects her, to me one of the most credible places to look in the record is Dr. Herfgen's neuropsychologist evaluation that begins at page 735. I wasn't sure that that helped you that much. What I like about that evaluation is— It says some very nice things about her. It does. It talks about how bright she is and how well she does on some tests, but on others, the ones that are essential for her job, she performs in the average range. One of the unanswered questions here is, if someone can perform in the average range on these tests, does that mean that they're qualified to do this former occupation, which required superior skills? That's one of the reasons that we think that a remand would be appropriate. It's just something that is not answered and that was jumped over in the process. And then as far as Ms. Stoddard's credibility issues go, I would note that during the course of the investigation, when UNUM did telephone calls to Kim Stoddard in June of 2014 and again in September, she was quite forthcoming about her volunteer work, her horseback riding, how often she did it. UNUM could have asked more specific questions. They could have been more engaged. Where did Judge Eagles get the impression that she was not forthcoming? I'm not sure about the not forthcoming part, Your Honor. I have gone through the records. That's what she said. I know, and I've looked for instances where she was not forthcoming, and I just can't find it. I can readily agree that when you have someone who's involved in horseback riding like this, that it raises questions and that UNUM is entitled to take a closer look. But my concern is just that... It's not just the horseback riding. I mean, we've talked a lot about the Mustang, but to be honest, it's all the extensive travel, which doesn't suggest a lack of stamina. These are much longer trips than most people take. It has to do with the work with the track organizations, which so closely resemble her former job. It has to do with the whole business. Right. The overall impression that's created is somebody who has a very wholesome and healthy lifestyle and is engaged in a variety of activities which many people would like to be able to be engaged in but don't have the ability to engage in many of the things that she is engaged in. And a lot of people who would love to go to Spain or Italy or Alaska or New Zealand would love to be able to ride Mustangs and do jumps and do the kind of creative design work that she's involved in. But they don't have the stamina, but she can do it all. She can do it all at times on good days, Your Honor, but just not on a full-time basis. You have good days and bad days. I have good days and bad days. We all, you know, Monday tends to be a bad day. Maybe I'm not as productive. Your Honor, one last thing. My red light is on. We addressed the travel issue on page 35 of our brief, but essentially they've taken about eight or nine years of travel and compressed it as though she's on the go all the time, and she's just not. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, Robert B. King, Henry F. Floyd